next term I assume next case for oral argument is 18-6006 N. Ray Daryll Christopher Dykes et al. James L. Snyder et cetera v. Daryll C. Dykes et al. Mr. Olive. Good morning. May it please the court. My name is Tom Olive. I represent Dr. Daryll Dykes and Dr. Sharon Dykes. Sharon is president in the courtroom today. Daryll could not make it. This case arises out of an adversary proceeding that was commenced as a result of the Dykes Chapter 7 bankruptcy in 2016. The United States Trustee's Office brought a complaint to deny discharge to my client. The complaint had three counts in it. Count one was to deny discharge based on certain transfers which in reality were payments in a significant amount of tuition and other expenses for their children in the year prior to filing. That was based on intent to hinder delay into fraud creditors. And the court found that they didn't meet their burden of proof so that's not an issue in this appeal. Yeah, actually the court found that we proved that there was no intent because of the burden. Yeah, exactly. That was the outcome. The second count and it's specifically alleged that some transactions involving back seven to five years prior and specifically the final transaction that occurred in 2013, Dr. Daryll Dykes collected very expensive watches and timepieces and that he, as a result, owed a significant amount of money to the jeweler he bought it for on credit. They got a loss, a judgment against him for over $300,000. To avoid a levy of his assets, he brought all the remaining timepieces that he had in his possession in 2013 to the office of the creditor's attorney, got a receipt showing everything he turned over and gave it to him in lieu of a levy. The U.S. Trustee's count two alleged that there was insufficient record keeping with regard to that. Well, the record keeping didn't relate to the turnover of assets to the attorney only. It related to the lack of paperwork and documentation for the receipt and return over a number of years of watches. So it was impossible to know what was received and returned and difficult to determine what his financial transactions were. Isn't that true? Ultimately, that's the court's findings and that's the frames. One of the issues were here before the panel today and that is two points to that. One, that that entire argument made by the U.S. Trustee at trial and that the judge found dealt with transactions prior to that, that wasn't pled at all in the pleadings. Why didn't you ask for a more definitive statement under the rule? Because it looked to us like count two was very clear. They were looking at the one transaction in 2013. There was nothing in the complaint that indicated they were looking to the prior transactions from seven to five years prior to the filing of the bankruptcy case. And so that wasn't something we were trying at the time. Apparently, it was something the U.S. Trustee based on their brief and their reply in here and various arguments they've made that they were trying. We weren't. We weren't looking to that. Were there stipulations on exhibits, though? Didn't you consent to the trial of those other transactions? Was there a stipulation to the exhibits or did the exhibits come in over objection? We stipulated to the introduction of exhibits, but we didn't stipulate to any additional issues. We just simply were cooperating with the U.S. Trustee's office to make the trial go quicker and cleaner. They had certain exhibits they wanted to introduce. We felt they were trying to attack our client's credibility. Probably would have been admissible. We didn't want to spend time on it. We weren't trying any additional issues. We kind of- I mean, it's relevant. I mean, I guess I'm not understanding that argument. If you let the exhibits in, then aren't you consenting to those issues being tried? Well, we didn't know that that was the issue. We just knew that they were exhibits showing watches that they had purchased. We didn't know what they were going for beyond that. So we weren't trying that issue. And even if you take it a step further and you say we were trying that issue, which we weren't, one looks at these transactions, and while we understand that the transactions are confusing, if you look at the testimony of Dr. Dykes and you look at the documents that were in the record, all of these transactions occurred in the time frame of 2009 to roughly 2011, more than five years prior to the filing of the case. The reason some of these records we just weren't sure of, you know, is laid out in the transcript and the testimony, but it had to do with the dramatic downturn in the Dykes' financial fortunes where they lost their home as a result of the foreclosure and a deficiency obtained on the foreclosure. The Dykes also, or Dr. Dykes, Dr. Daryl Dykes, lost his medical practice. The creditor levied on the member interest. He got terminated. His income went from back then, 2009-2010, to the high six figures, a significant amount, heck, way more than I made. Your response to Judge Shodin is look at the testimony. I think that's what you said, that the statute requires books and records in writing. Doesn't A3 require preservation or maintenance of documents, records, and papers? And the standard in the case law is what are reasonable records under the circumstances. And in this case, we're not talking about, and in a business context, the court has a higher context in terms of records. This isn't business. This was personal. It was hobby-related. It could be hobby-related, but it involved people who are educated and for a long period of time dealt with expensive transactions. Correct, and at the time, they didn't consider that they were having any issues with this. They were paying the bills regularly, paying everything off, and it's also the time frame of these transactions. If you go through the reported case law that we cite in our brief, almost every single case involves transactions in the zero to three years prior to the filing. You don't see many, or any, that I found, cases where the time frame was going back seven years. I mean, how long do you keep records? How long do we do that? And in this case, there's mitigating and intervening factors, one of which is when they lost all of their income, lost the house to foreclosure, he lost his medical practice, when he was forced to leave, and this is an issue in the case, is everything was put into three storage lockers. When he couldn't make the payments, the storage company sold those and got rid of them. He never saw any of it again. Some of the records, some of the things were in those things. But he had no records of what was in the storage lockers. No, because he never thought he'd lose them. He just put them in there to get out of the house. And, you know, that's one of the issues in the case, too, is that in paragraph 20 of the findings, the court cites an affidavit by a person who bought the storage locker. That affidavit was never admitted into evidence. We would have objected as to hearsay. Putting all that aside, did Judge Sandberg find that Dr. Dykes was not credible? I mean, what in her ruling would indicate that she made some clearly erroneous decision based upon? I mean, that's our standard of review, right? That's partially, but also this is a case of mixed findings of law and fact. And what we're looking at is the conclusions of law here. And whether, you know, number one, whether these things are outside the scope of the pleadings, which made it fundamentally unfair. That's the first issue. The second issue, if you get past that and we're trying that issue, is the application of the case law and the statutory law here, dealing with a reasonable person keeping records under the circumstances. Is that being met? Is the conclusions of law correct? Here we're saying, gee, if somebody didn't maintain records from seven to five years ago after going through all of the things they went through, does that constitute a failure to maintain records or a failure to maintain records, as the judge found in this case? Did you give us some case law? I did. Okay. And it's in the brief and certainly that can be reviewed. But the reasonableness of whether to keep the records or not is a finding of fact. Well, I think what happened is a finding of fact. Applying it to law is a conclusion of the law. Right. But if the bankruptcy court said it was not reasonable, that's a finding of fact, is it not? And we have to review that for the clearly erroneous, under the clearly erroneous standard?  Okay. That's accurate. We also were appealing the finding under count three, and that has to do with false oath on the schedules. The count alleged that the initial schedules in the case did not include a reference to all of the transfers that were referenced in count one that we discussed previously. And that's accurate. They weren't in there. It appears the court in its findings based everything on when amended schedules were filed in February 15th of 2017 that itemized these items. When in fact, and granted there's the credibility finding by the judge, but a lot of the testimony and the exhibits were uncontroverted. I don't know that it goes to a matter of credibility. They just weren't. There was, you know, when you're weighing credibility and there's opposite testimony in the record and you're saying, okay, I don't believe this, I believe this person, obviously that shifts the fact finding one way or the other. But here there was no contrary evidence. And the evidence on the false oath issue was the testimony of Dr. Dykes and also Sharon Dykes who testified that she, in the schedules, did what she thought she was supposed to do. It's in the transcript. There's a citation in the brief. And she also testified that she felt that the tuition payments and the expense payments were in the ordinary course of business. The testimony was basically that they had been paying the tuition for their children for ten years. These were the youngest two of five children. And they didn't see anything out of the ordinary with it. And so they didn't realize when they were giving the information to prepare the schedules that this was a transfer. They thought it was just paying a normal expense. As the testimony indicated, because it was disclosed in the three months prior to filing that the debtors had paid some tuition payments, the trustee, Ms. Mantia, at the 341, asked, did you pay any before that? And they said, well, yeah, we've been paying for years. Oh, could you get us that information? So we started compiling that information, providing it to Ms. Mantia voluntarily, and we provided it to the U.S. trustee's office. In the transcript, Dr. Dykes, Daryl Dykes, describes a December 15th email to the U.S. trustee transmitting an itemized list of all of the tuition payments during the requested time period when you're prior to filing. That list is what was attached to the answer in this case when we filed and was the basis for the ultimate schedule amendments. So the issue in the case law here, it appears on the issue of the false oath, it goes to whether the failure to disclose was reckless and whether there was an attempt at concealment. There was no attempt at concealment. They were disclosing everything. Reckless, well, they thought this was an ordinary payment. They didn't think it was something that was out of the ordinary. And in retrospect, they should have disclosed it. It should have been on the original schedules, but we don't believe it rises to the level of intent required under the statute in the case law. I see I have about two minutes left. I'll just reserve that for the bottom line. Thank you. If I say good morning, Ms. Levine, am I pronouncing your last name correctly? Yes, that's correct. It's Beth Levine with the Department of Justice for the United States trustee. And, Your Honors, the bankruptcy court, as you know, denied discharge in this case on three separate legal bases, each of which was supported by at least two different factual grounds. So there's seven independent bases for the bankruptcy court's denial of discharge, each one of which alone justifies denial of discharge and any one of which can support affirmance of the bankruptcy court's decision. And I'm not going to go through all of those now. It's in the briefs. I'm happy to answer any questions, but I'd like to hit a few key points. I don't have the complaint in front of me. Can you respond to this statement that was made by opposing counsel that the complaint only referred to the turnover of watches to the attorney in satisfaction of the jeweler's claim? Your Honor, the complaint focused on the turnover of watches, but it did also argue generally that it wasn't clear whether Dr. Dykes had or whether the Dykes' had additional watches. I think the phrase was it was unknown if he had additional watches. It's a notice pleading standard, and we think that was sufficient notice. But even if it wasn't, we do think that that claim was tried by consent. As you pointed out, the evidence was submitted without objection. The evidence was recited in the trial brief and the proposed findings of fact submitted before trial. And, you know, there's a slight difference on the A3 and A5 claim, both of which they argue there is a pleading deficiency. The A3 claim was pled. The A5 claim was not the complaint. We think both were tried by consent. Another difference with the A3 claim, though, is he did not argue, the appellants did not argue at any point in the bankruptcy court that the A3 claim could not be supported by this evidence. They argued in the post-trial brief that the A5 claim wasn't pled, but they didn't make that argument on the A3 claim. On the A3 claim, Mr. Olive points out that How far back did you want the records to be? Because he believes that we should focus on near bankruptcy. And although Mr. Olive didn't give me a time frame, one would suggest one to two years, three years before bankruptcy, not five to seven, as he pointed out. Certainly, Your Honor. And I think the time frame varies depending on the case. The real question is whether a creditor can determine what happened with the estate, what the financial affairs are. And it depends on context. And so the context here is the creditors, regarding the house that they lost, started foreclosure proceedings in 2008. The foreclosure judgment came in 2011. The confession of judgment on the watches was in 2011. The watches were returned in 2013. And so you've got a context where you've already got the lead-up to bankruptcy going on. And with respect to what's been called the paid-for watches in particular, the big issue is we don't know when they were transferred. That could have been last year. That could have been two years ago. That could have been a month ago. We don't know. And that is one of the issues that was addressed in the Bozzelli case in our brief is it's hard for them to bear the burden of or to carry their burden of justification that this was justified because it was too long ago when they haven't produced any evidence of actually when these transfers occurred. But doesn't that go more to the A-5, which was not specifically pled, which is the failure to explain the loss or presence of assets? Your Honor, they made that argument with respect to both A-3 and A-5. We think for both of those the transactions were not too far in the past and that both the lack of records regarding the disposition of the paid-for watches supports denial of discharge under A-3 and the unexplained loss of assets because there's no satisfactory explanation for what happened to those watches supports denial of discharge under A-5. But my point was that wasn't really pled, and so did they have notice of that cause of action under the complaint? Your Honor, I think that they did have notice, even if you think that the pleading on A-3 wasn't sufficient. And you're right, the A-5 claim was not a complaint. They had pre-trial notice that both these facts and the A-5 claim were coming in because they were raised in the trial brief. They were raised in the proposed findings of fact before trial. They did not object to the evidence. And they argued that – Would it not have been possible for them to assume that the A-5 references were mistakes when it wasn't pled in the complaint and it shows up in the pre-trial brief? Is that a routine thing? That seems like a pretty risky assumption, Your Honor. Well, it may have been risky, but my concern is the United States trustee pled certain matters in its complaint, and then we get to a pre-trial brief, and suddenly we're talking about things that haven't been pled. Is that the kind of practice that the U.S. trustee routinely engages in? Your Honor, I can't speak to that, and perhaps the better practice would have been to have amended the complaint. But I think that it didn't come across as just a mistaken – as a typo. I mean, I think the trial brief talked about a loss of assets. And, you know, whether you look at these paid-for watches – So you intentionally expanded the pleadings by your trial brief? Your Honor – It's okay to say yes because that is what happened. I think that is, in fact, what happened. And I think this was trial by consent. And, you know, if you want to say the A-5 claim is out of the picture, the lack of records regarding the disposition of these watches supports denial of discharge under A-3. And they argue that they didn't have notice because evidence that comes in to support a pled claim doesn't give you notice of an unpled claim. But there is no pled claim that they say this would go to. We don't have a complete record, as I see it, from the trial. Was there any objection raised at trial related to either evidence or the Court's consideration of the A-5 claim? No, not at trial, Your Honor, and not before trial. In the post-trial brief, they argued that the A-5 claim wasn't pled. They did not argue that the paid-for watches could not be considered for the A-3 claim, however. Your Honor, turning to the denial of discharge under subsection A-4 and the omission regarding the numerous transactions where the Dykes' paid expenses for their adult children, they focus on one specific question in the Statement of Financial Affairs. But the duty is complete candor, and they never explain. They've never attempted to explain why these expenses were not disclosed anywhere else in their Schedules of Statement of Financial Affairs. They don't explain, despite the fact that there were... It was in the stipulations of fact that it wasn't in there. The Court mentioned this, that these expenses weren't disclosed under Question 7 regarding payments to insiders, Question 13 regarding gifts over $600. And although this wasn't cited by the Bankruptcy Court, it's also in the record that under Schedule J, where they disclose all their expenses, there's a line for educational expenses, and that says zero. So the question really is not, should they have disclosed this under Question 18? The question is, should they have disclosed these transactions? And with their duty of complete candor, the answer is yes. Now, this is not just an oversight. They knew they made these payments, and Dr. Dykes testified, I read the instructions. He thought about this. He's a lawyer, isn't he? He is, yes. He got his J.D., I believe in 2014, I might be mistaken, but it was pre-petition. And he thought about whether to disclose these transactions and decided not to. Did I not read in Mr. Olov's brief that they didn't write those down because they were normal expenses of the family? And that's my point. They're really very carefully framing the issue as all about Question 18. But the issue isn't Question 18. The issue is, should they have disclosed these? And, you know, they could characterize this in one way or they could characterize it in another way, but you pick which bucket it falls in, there's a bucket for it in the schedules, and they should have made those disclosures. Were the expenses ongoing at the time they filed? Was this like a regular monthly payment? The testimony at trial was that they continued to make these payments both pre- and post-petition. Well, they should have been on Schedule J if they were still being made. I have, in other cases, I believe that is where it has been disclosed. And again, you know, you can characterize it different ways, but that doesn't excuse you from not disclosing at all. It might affect where you put it. If Your Honors have no further questions, I'll reserve the rest of my time. Thank you. Well, I have two minutes. I'll just point out is Dr. Dykes is a law school graduate. He's not a lawyer. He's never passed the bar, and he's never practiced. I think that was in the record. In response, I mean, it's clear, the transfer should have been listed in the original schedules. The question is how soon afterwards, when it was called to their attention, did they respond and provide accurate information? The issue is, did they try to... There's a lot of case law that says you shouldn't be prodded into disclosing. Correct. And what they were doing was going through their records, and it took some time to make sure that when they amended the schedules and provided the information to the U.S. trustee that the information was as accurate as possible. Don't you think it's interesting that they had records about that but not about the watches? Well, it's not... I think it's explainable and clearly explainable because this was the year prior to filing. The watches was 7 to 4 years before the filing. It was a significant period of time, and it was after the loss of the house, the storage containers, and the disaster. Okay, but I guess they talk about it being in the ordinary course of business, so it seems like they would have records going back for as long as they'd been paying those expenses for their children. I'm sure that what Dr. Dykes did was go through the bank statements and just identify the transactions, and they went back as far as they could. What was the amount owed to the retailer in Las Vegas, the watch retailer? Well, the judgment was for an excess... It's in the brief, but the judgment was in excess of $300,000, and after we filed the case, they filed a proof of claim, and then they amended it, and it looked like they gave credit for just over $100,000, between $100,000 and $150,000. The actual figures are in the brief. Thank you. The final thing I want to say is that this disaster that occurred to them when they lost their house, they didn't have a financial issue arising in 2008. It didn't arise until after the foreclosure occurred, because the real transaction there was the bank promised that they would term out a construction loan. When the time came, it turned out the bank officers had given them fraudulent information. Everything ballooned. They never had a problem making their ordinary payments or doing anything until they couldn't refinance from the balloon, and then that disaster occurred 2011, 2012, in the incidents we described. That's the end of my time. Thank you, Mr. Allen. Your Honors, I just have one final point to make in response. The confession of judgment was $390,000, and that just is a reminder that there was a lack of record regarding the watches that were returned. There's no pleading issue with that, and that alone is sufficient to affirm under Subsection 8.3 there's no third party who could look at this transaction and understand what actually the state of the financial affairs were because there's no way to know the value of the watches that were returned or how much debt is left. There was a confession of judgment of $390,000, but no way to determine how much of that debt remains even though the returns were made in 2013 and the filing for bankruptcy was 2016, several years later. So that alone is sufficient to affirm. Thank you. Thank you. Thank you. The last case set for oral argument is 18-6018, N. Ray Bryan A. Lurbachan, Bryan A. Lurbachan v. Seloff & Associates, P.A. Thank you. Mr. Headke. Good morning, Your Honors. Excuse me. My name is John Headke, and I'm representing the...